IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

MAY -1 2026

ARTHUR JOHNSTON
BY_____ DEPUTY

MALINDA MCDOUGALD on behalf of the
WRONGFUL DEATH BENEFICIARIES OF
MICHAEL ROY CARNEY, Deceased

**PLAINTIFF**

VERSUS

CIVIL ACTION NO. 1:26cv137 TBM-Rpm

JACKSON COUNTY, MISSISSIPPI;
JUSTIN KENDAL QUINNELLY; DERICK
WELTON; and JOHN OR JANE DOES 1-10

**DEFENDANTS**

## COMPLAINT

### [JURY TRIAL DEMANDED]

COMES NOW the Plaintiff, Malinda McDougald, on behalf of the Wrongful Death Beneficiaries of Michael Roy Carney, Deceased, by and through her attorneys, CHRISTOPHER C. "STOPHER" HAUG and the law firm of Haug, Farrar, Franco & Ruiz, PLLC, and would file this her Complaint against the Defendants named herein to recover damages for the killing of Michael Roy Carney by Jackson County Law Enforcement Officers. For grounds, Plaintiff presents the following to wit:

### I.    PARTIES

1.    Plaintiff, MALINDA MCDOUGALD, is an adult resident citizen of Harrison County, Mississippi and is the personal representative for the wrongful death beneficiaries of MICHAEL ROY CARNEY, Deceased, by Order of the George County Chancery Court on January 8, 2024 in that matter styled *In re Carney,* CV23-401-DNH, Chancery Court of George

County, Mississippi (Doc. 5).

2.      Defendant, JACKSON COUNTY, MISSISSIPPI, is a political subdivision of the State of Mississippi, located within the Southern District of the United States District Court, Southern Division (hereinafter "Jackson County").   Jackson County is responsible for the oversight, funding, regulation, and control of the Jackson County Sheriff's Office.  It is sued for its official law enforcement policy decisions. At all times relevant hereto, Jackson County employed Defendants  Deputy Justin Kendal Quinnelly, Deputy Derick Welton, and the as yet unidentified John or Jane Does 1-10. Defendant, Jackson County, Mississippi, may be served with process in the time and manner provided by law by and through service upon Josh Eldridge, in his official capacity as Chancery Clerk of Jackson County, Mississippi, at the offices of the Chancery Clerk, 2915 Canty Street, Suite R, in Pascagoula, MS 39567, or wherever he may be found, and through Ennit Morris, in his official capacity as President of the Board of Supervisors of Jackson County, Mississippi, at his office address of 2915 Canty Street, Pascagoula, Mississippi, or at 3104 Magnolia Street, Pascagoula, Mississippi.

3.      Defendant Deputy Justin Kendal Quinnelly (hereinafter "Deputy Quinnelly") is or was an officer with the Jackson County Sheriff's Office and was acting in that capacity, under color of state law, at all times pertinent to this lawsuit. Deputy Quinnelly shot and killed Mr. Carney individually and/or in concert with others. He is sued in his individual capacity and may be served with summons and complaint by personal service wherever he may be found pursuant to Mississippi Law and the Federal Rules of Civil Procedure.

4.      Defendant  Deputy Derrick Welton (hereinafter "Deputy Welton") is or was an officer with the Jackson County Sheriff's Office and was acting in that capacity, under color of

state law, at all times pertinent to this lawsuit. Deputy Welton operated the tactical MRAP vehicle that collided with Mr. Carney's truck, immediately before Mr. Carney was shot and killed. He is sued in his individual capacity and may be served with summons and complaint by personal service wherever he may be found pursuant to Mississippi Law and the Federal Rules of Civil Procedure.

5.    Plaintiff is ignorant of the true names and capacities of the remaining Defendants sued herein as JOHN OR JANE DOES 1-10, inclusive, and therefore sues these Defendants by such fictitious names and capacities.  Plaintiff will amend this complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and on that basis alleges that each fictitiously-named Defendant is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries were proximately caused by the conduct of each such Defendant.

## II.    JURISDICTION AND VENUE

6.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 and civil rights and subject matter jurisdiction under 28 U.S.C. § 1343 and Title 42 U.S.C § 1983 to address violations of the Fourth and Fourteenth Amendments to the United States Constitution and to redress the injuries sustained as a result of the negligent, reckless, and/or wanton conduct on the part of the Defendants and for the wrongful death of Michael Roy Carney caused by the Defendants.

7.    The causes of action alleged herein arose from the Defendants' acts and omission in George County, Mississippi, in the Southern District of Mississippi.

8.    Defendant Jackson County, Mississippi, is a political subdivision of the State

of Mississippi located in the Southern District of Mississippi.

9.      Defendant Deputy Justin Kendal Quinnelly is upon information and belief an adult resident of the State of Mississippi residing in the Southern District of Mississippi.

10.     Defendant Deputy Derrick Welton is upon information and belief an adult resident of the State of Mississippi residing in the Southern District of Mississippi

11.     Plaintiff Malinda McDougald is an adult resident of Harrison County, Mississippi, residing in the Southern District of Mississippi.

12.     Decedent Michael Roy Carney was an adult resident of George County, Mississippi, residing in the Southern District of Mississippi.

13.     This cause of action occurred or accrued in George County, Mississippi, in this District, and pursuant to Federal law venue is proper in this Court. Further, this court has jurisdiction over this cause of action and the parties pursuant to Mississippi law and Federal law.

### III.    FACTS

14.     Petitioner adopts and incorporates the foregoing allegations as if set forth verbatim herein.

### a.  The False Narratives Told to Media

15.     Decedent Michael Roy Carney was shot dead by law enforcement officers on May 3, 2023.

16.      According to news reports in the days following May 3, 2023, the George County Sheriff's Office ("GCSO") and/or Jackson County Sheriff's Office ("JCSO") (collectively referred to as "Law Enforcement Officers") reported that the shooting occurred after GCSO Officers went out to Mr. Carney's house on May 2, 2023, purportedly to serve a warrant.

17.      According to the news reports, the GCSO obtained a warrant because neighbors had reported that Mr. Carney had threatened to burn down a structure on Mr. Carney's property, and had been making "terroristic threats."

18.      Mr. Carney lived in rural George County, Mississippi, off of Jordan Road—a narrow country dead end road that turns off of Broome School Road.

19.      After the shooting, the Law Enforcement Officers told the media that they arrived in the vicinity of Mr. Carney's property in the afternoon of May 2, 2023. They reported that Mr. Carney refused to come out of his house, and that a sixteen hour stand-off ensued until the early morning hours of May 3, 2023.

20.      According to the reports made by Law Enforcement Officers to news media, when Mr. Carney emerged from his house early in the morning of May 3, 2026 he was in an "agitated state" and (depending on which news article is referenced) he either "waved," "pointed," or "brandished" a gun. According to at least two reports, Mr. Carney was said to have shot at the officers.

21.      According to the officers' reports to the media, based on the foregoing, they shot Mr. Carney and he died from his wounds.

22.     Reports claimed that the Mississippi Bureau of Investigations ("MBI") was called out, and that MBI was performing an investigation.

23.     The foregoing accounts of the events leading to Mr. Carney's death were not accurate.

24.     As it turns out, Mr. Carney was gunned down in his truck, where he had fallen asleep, on a public road miles from his home, and was not shooting at or threatening the Law Enforcement Officers.

### b. How Mr. Carney Was Actually Killed

25.     In the early afternoon of May 2, 2023, a relative of Mr. Carney's had called the GCSO and reported that Mr. Carney had threatened to burn down a structure on the property where Mr. Carney lived.

26.     In response, officers from the GCSO called Mr. Carney and engaged with him by phone in multiple calls on the afternoon of May 2, 2023.

27.     According to GCSO, Mr. Carney was agitated and upset during those calls.

28.     GCSO was made aware that Mr. Carney had previously had a mental writ issued on him.

29.     Following the phone calls between GCSO and Mr. Carney, GCSO obtained a warrant.

30.     At some point in the early afternoon of May 2, 2023, GCSO Officers went

to Broome School Road and Jordan Road and proceeded towards Mr. Carney's property.

31.      Jordan Road is a rural country road.  Mr. Carney's residence was located several miles down Jordan Road on a large piece of property with a yard and house set back from Jordan Road and fronted by large trees and shrubs, making visibility into the property from Jordan Road very difficult. There were no neighbors or residences anywhere around.

32.      By mid to late afternoon on May 2, 2023, a substantial law enforcement officer presence had developed around Broome School Road and Jordan Road.

33.      Upon information and belief, no law enforcement officers ever announced their presence or attempted to engage with Mr. Carney or attempted to serve the warrant.

34.      During the afternoon or early evening of May 2, 2023, the GCSO contacted the JCSO, which sent a Emergency Services Unit ("ESU") that included tactical "SWAT" team officers in an armored personnel carrier with a shooting turret referred to as a "Mine-Resistant Ambush Protected" vehicle (an "MRAP") to the area of Broome School Road and Jordan Road.

35.      As night fell, Law Enforcement Officers apparently hid in bushes and trees near Mr. Carney's property.

36.      During the evening, Law Enforcement Officers heard Mr. Carney visibly upset on his property, believed to be intoxicated and/or under the influence, and saw him coming in and out of his house and pacing around his property.

37.      According to some of these reports, officers heard shots being fired from Mr. Carney's property.   At no point does there appear to be any indication that Mr. Carney

knew that Law Enforcement Officers were near his property, much less that he was actively intentionally shooting at or towards Law Enforcement Officers.

38.    Subsequently, by approximately 8:00 p.m. on the evening of May 2, 2023, all Law Enforcement Officers left the area in front of Mr. Carney's property

39.    During the afternoon and evening of May 2, 2023, GCSO continued to communicate with Mr. Carney multiple times by phone. Mr. Carney repeatedly advised GCSO that Mr. Carney would not shoot deputies and that he "did not want to hurt anybody."

40.    Mr. Carney also communicated that he needed sleep and would seek help in the morning.

41.    The Law Enforcement Officers left the area, and planned to wait for daylight and approach Mr. Carney in the morning.

42.    At some point in the early morning hours of May 3, 2023, around 1:30 a.m., Mr. Carney got in his truck and left his property and headed down Jordan Road towards the stop sign at the intersection with Broome School Road. Mr. Carney parked his truck at the stop sign at the end of Jordan Road. There were no vehicles or people in sight. At some point, Mr. Carney fell asleep in his truck.

43.    Subsequently, at approximately 4:30 a.m., JCSO made a decision to use the MRAP tactical vehicle to travel to Jordan Road to make contact with Mr. Carney. Deputy Derrick Welton was driving the MRAP. As Mr. Carney's truck approached Broome School Road, the SWAT team in the MRAP suddenly raced across Broome School Road and rammed

into Mr. Carney's truck, disabling it and preventing it from being able to move.



44.    The MRAP did not have police lights or a siren on.

45.    The MRAP directed floodlights onto Mr. Carney's truck.

46.    JCSO Officers did not announce themselves.

47.    JCSO Officers did not attempt to serve the warrant on Mr. Carney.

48.    JCSO Officers did not attempt to arrest Mr. Carney.

49.    Mr. Carney did not attempt to exit his vehicle.

50.    Mr. Carney's driver's side window was rolled up.

51.    JCSO Officers say that Mr. Carney appeared to have been sleeping, and that he

appeared to have been awakened by the collision.

52.     Mr. Carney did not brandish, wave, or attempt to fire a weapon—much less actually fire a weapon.

53.     Mr. Carney presented no imminent threat to the JCSO Officers or any other person.

54.     Immediately after colliding with Mr. Carney's truck, JCSO Officers, including at least Deputy Quinnelly, opened fire on Mr. Carney shooting him through the front windshield multiple times.

55.     JCSO Officers saw that Mr. Carney appeared to still be alive.

56.     JCSO Officers then state that they backed up the MRAP, turned it slightly, and then rammed Mr. Carney's truck again.

57.     JCSO Officers, including at least Deputy Quinnelly, then again opened fire on Mr. Carney, shooting him through the front and drivers side window multiple times.

58.     The collision or collision with Mr. Carney's truck caused extensive and disabling damage to the truck.



59.      JCSO Officers shot at Mr. Carney at least thirty (30) times. Seventeen (17) shots struck Mr. Carney.

### c.    The Coroner's Report and McDougald's Investigation

60.      Law Enforcement Officers notified the George County Coroner at approximately 5:00 a.m.—shortly after the time ultimately determined to be the approximate time of death—but they refused to give her any information including where the incident occurred.

61.      Over two hours later, Law Enforcement Officers contacted the Coroner again, advising her of their location and requesting that she come to the scene of the shooting.

62.     Upon arrival at the scene of the shooting, the Coroner found Mr. Carney in his truck, and pronounced Mr. Carney dead.

63.     According to the Coroner, Mr. Carney was discovered in his truck, behind the steering wheel, slumped over to the right side. He was found to have been shot multiple times (forensics determined approximately 17 times), with "multiple wounds to his upper chest and abdomen."

64.     At the time of his shooting, Mr. Carney left behind a five year old son and a daughter.

65.     Mr. Carney's son's mother, Plaintiff Malinda McDougald, recounts that Mr. Carney was loving and caring father and that he would not want to leave his son behind. According to Ms. McDougald, Mr. Carney was not the type of person that would threaten police officers much less shoot at them.

66.     Suspecting that Mr. Carney's death had been unjustified, Ms. McDougald set about investigating his shooting, ultimately opening up an estate and becoming the named administrator. She was ultimately able to obtain a forensic report, as well as documents from MBI's investigation.

67.     Several months after Mr. Carney was killed, Mr. Carney's death certificate was finalized. It states that the cause of death was "homicide" resulting from "multiple gunshot wounds" and that Mr. Carney was found in his truck, at the intersection of Jordan Road and Broom School Road—*not* emerging from his house as law enforcement officers reported to the news media.

68.	According to the forensic report, there were three guns turned into the MBI. One was a Daniel Defense MR semi-automatic rifle, one was a Remington Woodmaster 742 (semi automatic), and one was a 12 gauge shotgun.

69.	According to the MBI's report, at least thirty (30) rounds were fired, based on shell casings turned into the MBI. The majority were from the Daniel Defense MR semi-automatic reportedly used by Deputy Quinnelly when he shot Mr. Carney. There were four shotgun shells turned in; and an undetermined number may have been from the other semi-automatic.

70.	Mr. Carney was shot with at least seventeen (17) rounds -- the majority of which apparently came from the Daniel Defense MR semi-automatic. Several other rounds that hit Carney were indeterminate.

71.	According to the Coroner's photographs of Mr. Carney's truck, by the time she arrived there was a shotgun in the cab of Mr. Carney's truck--barrel end down in the passenger side foot area, with the stock on the passenger seat.

### d. Violations of Law Enforcement Policy

72.	JCSO Policy 5.01, "Use of Force: Deadly & Less Lethal Force," clearly delineates when officers may resort to deadly force, specifying that it is appropriate only in situations involving individuals who are assaultive and pose a serious threat of bodily harm or death.

73.	Furthermore, the JCSO policy explicitly emphasizes that officers may not

intentionally use more force than is necessary and reasonable under the circumstances.

74.      Additionally, the JCSO policy on firearms handling underscores rigorous firearm safety, including strict muzzle discipline to avoid pointing firearms at anyone unless necessary and justified.

75.      Additionally, the general policy of the JCSO explicitly asserts that preserving innocent human life is more important than anything else—including the apprehension of criminals.

76.      Under the policy known as the Use of Force Continuum, a law enforcement officer can only use as much force that a reasonable law enforcement officer is faced with.

77.      Stated differently, if someone is assaultive, the law enforce can only use defensive tactics, not deadly force.

78.      Excessive Force is when a law enforcement office uses a level of force that exceeds the level of force a reasonable officer would perceive that he or she is faced with.

79.      The 4th Amendment of the United States Constitution guarantees the right of people to not have excessive force used against them during an arrest. This means that a law enforcement officer can only use force that is necessary.

80.      The 14th Amendment of the United States Constitution guarantees the right of people to equal protection under the law. This means that the law protects citizens from excessive force, or more than reasonable force.

81.      JCSO and the Law Enforcement Officers violated each of the foregoing policies and practices, and/or instead had policies or customs that differed from what the polices or customs should have been.

82.      As a proximate cause of the Defendants' wrongful acts, Mr. Carney lost his life.

## IV.    CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF § 1983
### AND FOURTH/FOURTEENTH AMENDMENT EQUAL PROTECTION
### AND DUE PROCESS

83.      The Plaintiff adopts, re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs in their entirety as though fully copied and stated herein.

84.      Decedent's rights, secured by the Fourth Amendment to the United States Constitution and the substantive due process clause of the Fourteenth Amendment were violated in the following particulars, all of which proximately caused Decedent's death:

A.      There was no showing of probable cause in the affidavit for obtained by the GCSO.

B.      Defendants never attempted to serve the warrant or advise Mr. Carney of their presence.

C.      Defendants caused Mr. Carney's death by ramming into his vehicle and shooting him without giving him a warning that law enforcement officers were present.

D.      Defendants fired shots constituting the use of excessive force against Mr. Carney, when they shot into his parked truck over thirty (30) times, hitting him seventeen (17) times, at a point when Mr. Carney was not a threat to the officers or the public.

E.      The ramming of Mr. Carney's vehicle and subsequent shooting of Mr. Carney was unreasonable, since officers would have known that Mr. Carney

did not pose a threat at that time.

F.   Defendants utilized deadly force against one reported and/or known to be in an agitated or disturbed state who made no threatening or menacing actions or threats to law enforcement officers or the public.

G.   Defendants acted with deliberate indifference to the safety and well-being of the Decedent.

H.   JCSO failed to properly train its staff, agents, and employees to comply with the appropriate standards and policies governing the detention, arrest, and incarceration of individuals, such as Michael Roy Carney.

I.   Defendants deprived Decedent of his constitutional rights owed to him under the law.

J.   Defendants recklessly disregarded the safety and well-being of Mr. Carney who was not engaged in criminal activity at the time he was shot and killed.

K.   The death of Mr. Carney was caused by official law enforcement policy decisions of JCSO and the individual defendants, acting independently and/or under color of state law, including policy decisions made by numerous deputies acting in concert resulting in the use of excessive force against Mr. Carney.

85.   Decedent endured pain and suffering and loss of life.

86.   The wrongful death beneficiaries of Mr. Carney are due all damages under the Mississippi wrongful death statute.

## COUNT TWO – FOURTH AND FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS LIABILITY UNDER *MONNELL*

87.   Plaintiffs incorporate by reference and re-allege the facts and information set forth in the foregoing paragraphs with the same force and effect as if set forth verbatim.

88.   At all times material herein, Defendant Jackson County had a legal duty to adopt and implement training, rules, policies and procedures to ensure that its deputies operated in a manner which is safe to all parties including under circumstances when engaged in confrontation,

service of warrants, arrests, and control and use of deadly weapons, particularly with people reported to be unstable and in crisis, including the Use of Force Continuum.

89.    Defendant Jackson County had exclusive management and control of the training, policies and practices of the operations and persons working at the JCSO regarding the training, method and manner by which its deputies would recognize and respond to reports of people that are agitated or in crisis, and when engaged in confrontation, service of warrants, arrests, and control and use of deadly weapons.

90.    Defendant Jackson County was acting under color of law and engaged in a course of conduct to implement a training, policies, customs, usages, plans or practices concerning method and manner by which its deputies would recognize and respond to reports of people that are agitated or in crisis, and when engaged in confrontation, service of warrants, arrests, and control and use of deadly weapons.

91.    Defendant Jackson County violated Decedent's rights by the custom, policy and/or practice of failing to train, instruct, supervise, control, and discipline the deputies concerning the method and manner by which its deputies would recognize and respond to reports of people that are agitated or in crisis, and when engaged in confrontation, service of warrants, arrests, and control and use of deadly weapons.

92.    Said custom, policy, practice, and usage caused the deprivation of Mr. Carney's rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §1983.

93.    There exists within the JCSO unwritten customs, practices and usages for the

method and manner by which their deputies would recognize and respond to reports of people that are agitated or in crisis, and when engaged in confrontation, service of warrants, arrests, and control and use of deadly weapons, such that they are and were the moving force behind and thereby caused the constitutional deprivations of Decedent as have been set forth herein.

94.    JCSO and its SWAT team had an official policy or unofficial custom of engagement regarding someone who is or may be threatening violence, but poses no danger.

95.    The proper policy and/or custom would be safety and containment of the subject.

96.    Instead, the policy and/or custom was direct engagement regardless of whether the subject was an actual danger.

97.    Even though Law Enforcement Officers created a containment zone, JCSO disrupted and stopped the containment zone.

98.    Based on information and belief, this was at the direction of JCSO, so it could set up to do a direct engagement of Mr. Carney, an individual that did not pose any danger and had been contained.

99.    JCSO, exercising their policy or custom of engagement instead of containment, moved in and created the interaction when it knew that Mr. Carney had been previously contained and was not posing a threat, but was going through a mental health episode or was agitated or in crisis.

100.    This policy or custom of engagement of someone who in such a state was the

moving force behind the violation of Mr. Carney's right to be free from excessive force.

101.    That policy and/or custom was deliberately indifferent as JCSO knew or should have known such policy would lead to deadly force being used in a situation where deadly force was not needed or appropriate.

102.    The proper policy was developed and taught for decades to law enforcement for situations just like this situation and it is generally known within the law enforcement community that the entire purpose for creating a containment zone is to prevent a deadly interaction with police.

103.    JCSO failed to train, supervise, and implement the proper policy/custom, but instead trained, supervised, and implemented an improper policy and/or custom of engagement.

104.    The failure of JCSO to adopt and/or implement appropriate policies and procedures for the method and manner by which its deputies would recognize and respond to reports of people that are agitated or in crisis, and when engaged in confrontation, service of warrants, arrests, and control and use of deadly weapons amounts to deliberate indifference under 42 U.S.C. § 1983.

105.    As a result of the failure of JCSO to adopt and/or implement appropriate policies and procedures for the method and manner by which its deputies would recognize and respond to reports of people that are agitated or in crisis, and when engaged in confrontation, service of warrants, arrests, and control and use of deadly weapons, deprived Decedent of his rights in violation of the Fourth and Fourteenth Amendments to the Constitution of the United States and remediable under 42 U.S.C. § 1983.

106.    The acts of Defendant Jackson County as described above were wanton, and/or exhibited a reckless indifference to the federally protected rights of Mr. Carney, thus entitling Plaintiff an award of punitive damages against Defendant Jackson County and/or the individual Defendants.

## COUNT THREE - Attorney Fees

107.    The Plaintiff adopts, re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs in their entirety as though fully copied and stated herein.

108.    As a direct and proximate cause of the Defendants' actions, it was necessary for Plaintiff to retain legal services of Haug, Farrar, Franco & Ruiz, PLLC in order to pursue her claim for violations of Decedent's civil and constitutional rights.

109.    Plaintiff contends that if/when she is a "prevailing party" she will be entitled to an award of reasonable attorney fees as a part of the cost of prosecuting the present cause of action for violations of Mr. Carney's 4th and 14th Amendment rights (42 U.S.C. § 1983) under the Civil Rights Attorney's Fees Award Act of 1976 (42 U.S.C. § 1988).

## COUNT FOUR -- DAMAGES AND REMEDIES

110.    The Plaintiff adopts, re-alleges and incorporates by reference each and every allegation contained in the foregoing paragraphs in their entirety as though fully copied and stated herein.

111.    As a direct and proximate result of Defendants' actions described hereinabove, the Decedent was caused to suffer the following injuries and damages:

A.  loss of enjoyment of life, emotional and physical pain and suffering, loss of earning capacity, loss of career opportunities;

B.  Future lost wages and loss of wage earning capacity;

C.  Attorney fees and costs, plus pre-judgment and post-judgment interest; and

D.  All other damages available under federal and state law, including punitive and/or exemplary damages.

112.     That the aforesaid damages to the Decedent having been proximately caused by the negligence, gross negligence, wanton indifference, reckless disregard and/or malicious or intentional acts of the Defendants, the Plaintiff is entitled to sue and recover damages proximately resulting therefrom, including compensatory damages, punitive damages, attorney's fees, pre-judgment and post-judgment interest, and such other relief as Plaintiff may be entitled to under the laws of Mississippi and the United States.

WHEREFORE PREMISES CONSIDERED, Plaintiff demands judgment of and from the Defendants in an amount that will reasonably compensate Plaintiff for injuries and/or damages of the Decedent and to punish Defendants in order to deter future wrongful conduct, including but not limited to the following:

a.  Compensatory and/or punitive damages directed against the Defendants, jointly and severally, in excess of $75,000, exclusive of all costs and interest, for injuries sustained by the Decedent as a result of the actions, practices and omission of the Defendants in their treatment of Mr. Carney;

b.  Additional punitive damages directed against the Defendants, jointly and severally, in excess of $75,000, exclusive of costs and interest, for the

willful and wanton actions, practices and omissions on the part of the Defendants jointly and severally, as described hereinabove, as provided under Mississippi and Federal law;

c.     Reasonable attorney fees; and

d.     All costs of court incurred herein, as well as all pre-judgment and post-judgment interest as may be allowed by law.

Date:  May 1, 2026.

Respectfully submitted,
**MALINDA MCDOUGALD, on Behalf of the Wrongful Death Beneficiaries of MICHAEL ROY CARNEY**

BY: _____
CHRISTOPHER C. "STOPHER" HAUG.
(MSB # 102850)
Attorney for Plaintiff

CHRISTOPHER C. "STOPHER" HAUG
HAUG, FARRAR, FRANCO & RUIZ, PLLC
2336 Government St., Ocean Springs, MS  39564
Telephone:   228.872.8752
Telefax:       877.325.2747
Email:         stopher@hffrlaw.com
Website:      www.hffrlaw.com
ATTORNEY FOR PLAINTIFF